In re BICOASTAL CORPORATION f/k/a the Singer Company, I.D. # 06–1230713, Debtor.

UNITED STATES of America, Appellant,

v.

BICOASTAL CORPORATION f/k/a the Singer Company, I.D. # 06–1230713, Appellee.

No. 90–573–CIV–T–17–B.

United States District Court, M.D. Florida, Tampa Division.

March 29, 1991.

James A. Gresser, U.S. Dept. of Justice, Civil Div., Commercial Litigation Branch, Washington, D.C., John Patrick, U.S. Attorney's Office, Tampa, Fla., for appellant.

Harley Edward Riedel, II, Stichter & Riedel, P.A., Tampa, Fla., Donald E. Engle, Oppenheimer, Wolff & Donnelly, St. Paul, Minn., for appellee.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA

KOVACHEVICH, District Judge.

This cause is before the Court on appeal from the Order granting Debtor's Motion for Authority to Merge Defined Benefit Pension Plans entered on March 29, 1990, by Chief Bankruptcy Judge Alexander L. Paskay.

STANDARD OF APPELLATE REVIEW

Findings of fact by the Bankruptcy Court will not be set aside unless clearly erroneous. Bankruptcy Rule 8013; *In re Downtown Properties, Ltd.*, 794 F.2d 647 (11th Cir.1986). However, appellant is entitled to an independent, *de novo* review of all conclusions of law and the legal significance accorded to the facts. *In re Owen*, 86 B.R. 691 (M.D.Fla.1988).

FACTS

Debtor, Bicoastal Corporation, f/k/a The Singer Company, was formerly engaged in the defense contract business. Many of Debtor's contracts were with Appellant, the United States of America, under which it provided certain goods and services to the Department of Defense. These contracts were to be performed by one of Debtor's unincorporated sub-divisions. Each of these contracts was governed by the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et seq*, and was subject to the Federal Acquisition Regulations (FAR) and Cost Accounting Standards (CAS).

Prior to January 1988, Debtor entered into hundreds of contracts with Appellant, many of which were entered through several of Debtor's unincorporated sub-divisions. Under these contracts Appellant contributed substantial amounts of money to certain Defined Benefit Pension Plans set up for both employees of Debtor and Debtor's sub-divisions.

In 1988, Debtor was involved in a leveraged buyout whereby it entered into a merger agreement with the Singer Acquisition Company. As part of this process, all of Debtor's operating sub-divisions which were previously unincorporated, were incorporated. Debtor, and each of its newly incorporated subsidiaries entered into a "Novation Agreement" whereby the Government contracts were transferred from Debtor to the newly incorporated subsidiaries. The Novation Agreements also contained provisions whereby Debtor and its newly incorporated subsidiaries would be jointly and severally liable for any violation of applicable Cost Accounting Standards. Furthermore, the agreements provided that Debtor would furnish Appellant with 60 days advance notification in writing of any material changes which affected any of the pension plans which were sponsored by Debtor and partially contributed to by Appellant.

Following the merger and subsequent incorporation of Debtor's sub-divisions, Debtor began to sell the stock of its newly incorporated subsidiaries to various purchasers. Under these purchase and sale agreements, Debtor agreed to continue to sponsor several of the defined benefit pension and retirement plans for each of the

subsidiary's white collar employees up to the date of sale. However, no new employees were permitted to enter the plans, and members of each retained plan became vested of their rights to their pension as of the date of the sale.

As a result of Debtor selling its subsidiaries, there was a dispute as to whether these sales constituted "segment closings" within the meaning of Cost Accounting Standards 60.413–50(c)(12), codified at 4 C.F.R. § 413.50(c)(12) (1990). Debtor filed a motion for summary judgment with the Bankruptcy Court, seeking a determination that the sale of its subsidiaries did not constitute "segment closings." As of the date this appeal was filed, the Bankruptcy Court had not ruled on this issue.

In February 1989, Appellant notified Debtor of its initial determination of Debtor's noncompliance with certain Cost Accounting Standards with respect to pension costs. A further dispute remains as to the adequacy of the information supplied by Debtor to Appellant between February 1989 and November 1989.

In November, 1989, Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. On December 18, 1989, Appellant, on behalf of the Defense Logistics Agency, filed a Proof of Claim against Debtor for $142,300,000, the estimated amount of overfunding attributable to Government overpayment to the pension plans. Appellant alleges that the "freeze" of the retained pension plans altered the underlying actuarial assumptions applicable to those plans, resulting in the overfunding of the pension plans.

Due to its intent to merge the pension plans into a single Revised Retirement Plan, Debtor did not make any of the quarterly payments to the pension plan funds during 1989. Debtor would have otherwise been required to make these payments in the absence of the merger.

As a result of the Debtor not making these quarterly payments at least one pension plan became underfunded by approximately 5 million dollars. By merging the overfunded pension plans with the underfunded plans, the deficit would be cured.

On December 20, 1989, Debtor filed a Motion to Merge its overfunded Defined Benefit Pension Plans (partially attributable to overpayment by the government) with its underfunded Defined Benefit Pension Plans, whereby the excess funds in the overfunded plans would cure the deficit in the underfunded plans.

On December 28, 1989, Appellant filed a written objection to Debtor's Motion for Authority to Merge Defined Benefit Pension Plans.

On December 29, 1989, six business days after Debtor's Motion to Merge was filed, the Bankruptcy Court heard the motion. Debtor claimed and successfully argued to the Bankruptcy Judge that a merger of its defined benefit pension plans is something which it has done in the past in the ordinary course of business. Debtor further demonstrated that authorizing the merger, vehemently opposed by Appellant, would be in its best interest if completed on or before December 31, 1989. The merger would permit Debtor to use its resources more efficiently and effectively by reducing future administration costs, actuarial and legal expenses and future pension plan contributions.

On March 29, 1990, the court granted Debtor authorization to merge the defined benefit pension plans. On April 9, 1990, Appellant filed its notice of appeal from the Bankruptcy Court's order permitting Debtor to merge the plans.

## ISSUES

I. WHETHER THE BANKRUPTCY COURT ERRED IN FINDING THAT THE DEFINED BENEFIT PENSION PLANS WERE PROPERTY OF THE DEBTOR'S ESTATE.

II. WHETHER THE BANKRUPTCY COURT ERRED IN FINDING THAT THE MERGER OF THE DEFINED BENEFIT PENSION PLANS WAS IN THE ORDINARY COURSE OF THE DEBTOR'S BUSINESS.

III. WHETHER THE BANKRUPTCY COURT ERRED IN PERMITTING

THE DEBTOR TO AVOID THE SIXTY DAY NOTIFICATION PERIOD OF THE NOVATION AGREEMENT.

## DISCUSSION

### I

■ Section 541 of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever located or by whomever held. 11 U.S.C. § 541(a)(1). Appellant and Debtor concede section 541 gives a debtor wide latitude in dealing with estate assets. *See Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 966 (5th Cir.1983), quoting *U.S. v. Whiting Pools Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Pursuant to sections 541(b) and (c)(2), certain assets are specifically excepted from the broad interpretation give to the term "property of the estate." 11 U.S.C. § 541(b) and (c)(2). These excepted assets do not apply here.

Appellant recognizes that its ability to have any interest in the surplus of the defined benefit pension plans fully "refunded" is largely dependent upon the plans remaining outside of Debtor's estate. Appellant argues that the pension plans in question were not property of Debtor's estate, and therefore the Bankruptcy Court lacked jurisdiction to grant Debtor's motion to merge the plans. Appellant, however, concedes that if the surplus in the overfunded plans were assets of Debtor's estate, then Debtor may have a right to use the surplus in its ordinary course of business.

■ Although a claimant may have an equitable interest in the assets of a debtor, such an interest, by itself, is not sufficient to remove the surplus from property of the debtor's estate under Section 541 of the Bankruptcy Code. The Code does not remove an asset from the bankrupt's estate simply because a third party has claimed an interest in that asset. Property that the bankrupt holds subject to the interest of another entity, becomes property of the

estate subject to that interest. 11 U.S.C. § 541(d). *See also, Georgia Pacific Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 966 (5th Cir.1983).

Appellant's alleged equitable interest in the surplus of the pension plans would not be sufficient to remove the plans from Debtor's estate. Appellant contends, therefore, that the pension funds are not property of the estate because they are being held by Debtor in a constructive trust for Appellant.

The Eleventh Circuit noted in *T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372 (11th Cir.1989), that the legislative history of 11 U.S.C. § 541 makes it clear that funds in a debtor's possession held for a third party do not become part of the estate in bankruptcy. *Id.* at 1376. *See also, U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (property of others held in trust at the time of filing a petition for bankruptcy was not property of the debtor's estate). Even when there is not an explicit agreement between two parties "[s]ituations [may] occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another." *T & B Scottdale,* 866 F.2d at 1376, quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5868, 6324.

■ However, the burden of establishing a trust relationship is on the party claiming the benefit of such a relationship. *Georgia Pacific,* 712 F.2d at 969 (quoting 4 Collier on Bankruptcy, para. 541.13 at 541–67 (15th ed., 1983)). Once the claimant has presented its evidence, it is for the Bankruptcy Court, not a stakeholder with an interest in assets of the debtor, to determine if such assets are, in fact, property of the estate. *Georgia Pacific,* 712 F.2d at 968.

■ A constructive trust is established through a contract or implied agreement between two parties with a mutual understanding that specific assets will be held by

one party in trust for the other. *See generally, T & B Scottdale Contractors, Inc.,* 866 F.2d at 1372; *Georgia Pacific Corp.,* 712 F.2d at 969. A business contract which contains a provision requiring a contractor to contribute money to a pension fund set up by a subcontractor for its employees, does not suggest the deposited funds are held in trust for the contractor. Absent evidence to the contrary, the proper beneficiaries of a pension plan fund are those people for whom the fund was set up. Under the contractor-subcontractor scenario, if a trust were to be recognized, absent evidence to the contrary, it would be recognized in favor of the employees of the subcontractor, not the contractor.

In *Georgia Pacific,* the claimant did not meet its burden of presenting clear evidence that a trust was established in its favor. Consequently, the Fifth Circuit held that the Bankruptcy Court did not err in finding that the funds in question were property of the debtor's estate. *Id.* at 972. Reversing the district court, the Fifth Circuit gave deference to the Bankruptcy Court's determination that a trust in favor of the claimant did not exist. Since a trust relationship was not established the property rightfully belonged to the debtor's estate.

By contrast, in *T & B Scottdale,* supra, undisputed evidence was presented of a bilateral agreement creating a trust. In *T & B Scottdale,* funds were deposited into a joint account opened by the contractor, in the name of the subcontractor. *T & B Scottdale,* 866 F.2d at 1376. It was undisputed that the funds deposited into the account were solely for the use and benefit of the subcontractors. *Id.* The subcontractor subsequently filed for bankruptcy under Chapter 11 and the trustee in bankruptcy claimed that the joint account funds held in trust for the subcontractor were property of the bankrupt estate. *Id.* Based on the conclusive evidence which established a trust, the Eleventh Circuit held that the checks were not property of the bankrupt's estate. *Id.* The Court further distinguished *Georgia Pacific,* stating in that case the assets properly remained part of the debtor's estate due to the lack of evidence of a mutual agreement between the parties in support of a constructive trust in favor of the claimant. *Id.* at 1376, citing *Georgia Pacific,* 712 F.2d at 971–72.

Although Appellant overfunded the Debtor sponsored pension plan, the overfunding was eventually to be used for the benefit of the employees of Debtor and its incorporated subsidiaries. Thus, if the money was being held in trust for anyone, the proper beneficiaries would be the employees, not Appellant. Even if a termination of the pension plan sponsored by Debtor had occurred and Appellant was entitled to an equitable interest in the overfunding pursuant to FAR 31.205–6(j)(4), Appellant has simply stated a trust was set up in its favor without providing any evidence to support this assertion. Although the contracts which Debtor and Appellant entered into contain an express provision which requires Appellant to contribute to the pension plans which cover Debtor's employees, this provision is not sufficient evidence to support a "trust-like" arrangement in favor of Appellant.

This Court does not accept Appellants constructive trust theory, and concludes, that the funds, although possibly subject to an equitable interest by Appellant, were property of Debtor's estate. This Court holds that the Bankruptcy Court had proper subject matter jurisdiction to hear this case. However, if Appellant were to establish an equitable interest in the surplus funds of the pension plans, the interest would be subject to recognition by the Bankruptcy Court. 11 U.S.C. § 541(d). *See also,* Collier, para 541.13.

## II

■ Section 363(c)(1) of the Bankruptcy Code permits a debtor to use property of its estate in the ordinary course of its business. The merger of the pension plans was a function consistent with the general administrative handling of the Debtor's business and consistent with the Debtor's past practice. By approving the Debtor's request for authority to merge the defined

benefit pension plans, the Bankruptcy Court necessarily found that the merger, was in Debtor's ordinary course of business. As stated by the United States Supreme Court:

The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the fact is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

*Anderson v. City of Bessemer*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985). *See also, Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303 (5th Cir.1985).

Rule 8013 of the bankruptcy rules, which this Court applies in this case, mandates the application of the "clearly erroneous" standard of review to the Bankruptcy Court's finding of fact. Its language tracks the "clearly erroneous" standard of Rule 52(a) of the Federal Rules of Civil Procedure almost verbatim. Finding the Court's reasoning in *Anderson* equally applicable to this case, the Court finds the Bankruptcy Court did not err in concluding the merger was in the ordinary course of Debtor's business.

■ Appellant asserts that it has an equitable interest in that portion of the defined benefit pension plans which it overfunded. Appellant claims it is entitled to this interest under the Congressionally mandated Federal Acquisition Regulation (FAR) because Debtor closed a segment of its business upon the sale of each of its subsidiaries and the accompanying defined benefit pension plans were effectively terminated. Debtor concedes that the contracts in question were subject to regulations under Cost Accounting Standards (CAS), sections 412 and 413, 4 C.F.R. §§ 412 and 413. Section 400 through 420 of 4 C.F.R. are incorporated into FAR at 30.400 through 30.420.

The determination of whether a "segment closing" had occurred within the meaning of CAS 413.50(c)(12), has been a subject of extensive litigation between Appellant and Debtor both prior to and following the filing of this appeal. Section 413.-50(c)(12) states:

If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. . . .

4 C.F.R. § 413.50(c)(12).

Appellant contends that the purchase and sale of Debtor's subsidiaries resulted in a "segment closing" of those portions of Debtor's business. Appellant informed Debtor that it determined when it sold its stock interest in the subsidiaries and the CAS covered prime contracts were effectively assigned to the purchasers, a "segment closing" had occurred.

Upon its own determination that a "segment closing" occurred, Appellant requested information pursuant to CAS 413.-50(c)(12). There was a dispute between Appellant and Debtor as to whether Debtor ever provided this information. Although Appellant claimed that it was entitled to this information, Appellant further contends that it is entitled to claim an equitable interest in the overfunding pursuant to FAR 31.205–6, 48 C.F.R. § 31.205.6.

■ If a claimant contributed funds to a pension plan set up for the employees of a corporate Debtor's subsidiaries, and if the subsidiaries are "segments" and the subsequent sale of these segments legally amounts to a "segment closing", the claimant, pursuant to FAR 31.201–5 and 31.205–6, is entitled to assert an equitable interest in any surplus in the pension plans attributable to the claimants contributions. *See In re Bicoastal Corporation*, 124 B.R. 593 (Bkrtcy.M.D.Fla.1991). If the segments are, in fact, closed when the debtor sells its

stock interest in the subsidiaries, FAR 31.-201–5 establishes the claimant's equitable interest to the surplus of the overfunded plans by way of FAR 31.205–6(j)(4). *Id.* FAR 31.201–5 entitled "Credits", states:

The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or a cash refund. *See 31.205–6(j)(4) for rules related to refund or credit to the Government upon termination of an overfunded defined benefit pension plan.*

48 C.F.R. § 31.201–5 (Emphasis added). Section 31.205–6(j)(4) entitled "Termination of Defined Benefit Pension Plans", provides:

When excess or surplus assets revert to the contractor as a result of termination of a defined benefit pension plan, or such assets are constructively received by it for any reason, the contractor shall make a refund or give credit to the Government for its equitable share. The Governments equitable share shall reflect the Governments participation in pension costs through those contracts from which certified ... cost or pricing data were submitted or which are subject to subpart 31.2.

48 C.F.R. § 31.205.6(j)(4). According to this section, a pension plan must terminate in order for the Government to be entitled to claim an interest in the overfunded surplus of a pension plan.

Appellant claims for CAS and FAR purposes a *"de facto"* termination of the pension plans occurred upon the sale of each of Debtor's subsidiaries. Appellant asserts that upon each sale, contributions which were previously required to be made by Appellant on behalf of the white collar employees of the subsidiaries ceased. Furthermore, upon the sale of each subsidiary, the actuarial assumptions that were once contingent liabilities were no longer real risks, the pension plans were frozen, no new employees were permitted to enter the plans and all pension rights vested in the participating employees.

Debtor does not dispute Appellant's assertions concerning the effect the sale of the subsidiaries had on the retained pension plans. However, Debtor denies a "segment closing" under the FAR has occurred, and claims that FAR 31.201–5 and 31.205.6(j)(4), are not applicable. Debtor contends that because the issue of whether a segment closing had occurred has not yet been resolved, Appellants' claim to an equitable interest in the surplus of the pension plans must fail.

In the course of the continuing controversy which led to this Appeal, Debtor filed a motion for summary judgment with the Bankruptcy Court contending that since there were no genuine issues of material facts it was entitled to a judgment as a matter of law in its favor determining that a "segment closing" had not occurred. At the time Debtor filed this appeal the motion had not been heard by the Bankruptcy Court.

The Bankruptcy Court recently ruled on Debtor's motion for summary judgment. *In re Bicoastal Corporation,* 124 B.R. 593 (Bkrtcy.M.D.Fla.1991). Although the decision was subsequent to the filing of this appeal, the court's ruling is relevant and applicable.

In his opinion, Chief Bankruptcy Judge Alexander L. Paskay, in reference to the Government's (Appellant in the case at bar) claim to the overfunding of the pension plans, stated:

Because of certain provisions which govern Government contracts in general ... it is necessary to consider initially a very limited issue, which might very well control the outcome of the entire controversy. This issue relates to the interpretation of the terms used in regulations of "segments" and the interpretation of the term "SEGMENT CLOSING". This is so because if, in fact, the divisions of the Debtor and, later on, the Debtor's subsidiaries were deemed to be "segments" and when the stocks in the subsidiaries were sold, the sale legally amounted to a "SEGMENT CLOSING", this would have been the historical event which in turn would have triggered the Government's

right to audit the pension and retirement plan sponsored by the Debtor and assert a claim for overfunding of the plan against this Debtor.

*Id.* The Bankruptcy Court then addressed the issue of whether the subsidiaries sold by Debtor were, in fact, "segments". Under CAS a "Segment" is defined as:

One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product service.... The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority of ownership, but over which it exercises control.

4 C.F.R. § 413.30(a)(11). The court decisively concluded that the subsidiaries sold by Debtor were "segments" within the meaning of the FAR. *In re Bicoastal Corporation,* 124 B.R. 593 (Bkrtcy.M.D.Fla. 1991).

Within Debtor's motion for summary judgment, the Bankruptcy Court was presented with facts similar, if not identical, to the facts presented to this Court on appeal. In reviewing the summary judgment motion the Bankruptcy Court found, and this Court agrees, that Appellant's most convincing argument in favor of a segment closing is found in the Singer Company Master Trust Agreement dated December 29, 1980, furnished to Appellant by Debtor. The Trust Agreement which established the trust in which the pension funds were deposited, provides in part:

This agreement shall terminate with respect to a Plan ... by the Company's sale or dissolution of the Subsidiary responsible for making contributions to the Plan Account.

Based on the Trust Agreement and the other facts presented, Judge Paskay stated:

The sale of the stock, coupled with the undisputed fact that the Debtor no longer has anything to do with the contracts assumed and performed by its former subsidiaries, and coupled with the effective termination of the retained pension and retirement plans left little doubt that the SEGMENTS were CLOSED.

*In re Bicoastal Corporation,* 124 B.R. 593 (Bkrtcy.M.D.Fla.1991). The court denied Debtor's motion and held that the segments of Debtor's business, upon sale of its subsidiaries, did amount to a "segment closing". *Id.* This Court agrees.

Upon determination of a segment closing, FAR 31.205–6(j)(4) becomes effective. Pursuant to this section a refund or credit for Appellant's equitable interest in the pension plans would be warranted if the pension plans were also terminated. Concluding that the pension plans were effectively terminated, Appellant became entitled to an equitable interest in the surplus of the pension plans. This Court therefore finds on the issue of Appellant's asserted interest in the pension plans that the Bankruptcy Court erred as a matter of law in permitting the pension plans to be merged before appellant had the opportunity to claim its entitled share.

### III

■ At Debtor's request, as part of the leveraged buyout, "Novation Agreements" were executed by Appellant, Debtor and each of Debtor's newly incorporated subsidiaries. These agreements transferred the Government contracts to Debtor's subsidiaries. As a condition of the transfer, Debtor, as transferror, agreed to retain liability for any contract violation by the transferee, the subsidiaries. Each Novation Agreement contained a provision whereby Debtor agreed to provide Appellant with sixty days advance notification in writing of any change which would materially affect the pension funds.

On December 20, 1989, Debtor filed its petition for authority to merge the defined benefit pension plans, at which time Appellant was notified of Debtor's intentions. The motion was heard by the Bankruptcy Court on December 29, 1989, giving Appellant six business days to evaluate the merger and prepare its opposition. Appellant argues that Debtor's conduct constituted a manifest breach of the Novation Agreement which alone should have afforded sufficient reason for the Bankruptcy Court to deny the merger.

Section 365(a) of the Bankruptcy Code provides that, with exceptions not relevant here, "the trustee [or debtor], subject to the courts approval, may assume or reject any executory contract...." 11 U.S.C. § 365(a). Accordingly, a Debtor in Possession has broad discretion in deciding whether to assume or reject an executory contract. This issue is not in dispute between the parties to this case.

It is widely accepted that when a court reviews the rejection of an executory contract

> the generally accepted standard ... is the business judgment rule, the same test applied to judicial review of corporate decision-making in other contexts.... This lax standard directs courts to approve the debtor's actions where the latter demonstrates that rejection will benefit the debtor's estate or reorganization efforts. Only where the debtors actions are in bad faith or in gross abuse of its managerial discretion should the decision be disturbed.

*Johnson v. Fairco*, 61 B.R. 317, 320 (N.D. Ill.1986) (citations omitted). The widely developed standard of the business judgment test has been applied as an alternative to the previous standard that only "burdensome" executory contracts could be rejected. *In Re W & L Associates, Inc.*, 71 B.R. 962, 966 (Bankruptcy E.D.Pa.1987) Furthermore,

> the business judgment test [is not considered] to be a strict standard to meet. Rather, the test merely requires a showing by the trustee or debtor in possession that rejection of the contract will be likely to benefit the estate.

*Id.* at 966, citing *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The Fifth Circuit has also recognized that "more exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the courts ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir.1985).

The Bankruptcy Court found that the merger would be in the best interest of the Debtor's estate. Thus, the sixty-day notice provision of the Novation Agreement was waived. Debtor contends that if this Court were to find that Appellant was entitled to sixty days notice, failure to give the notice was harmless error. This Court disagrees.

The sixty-day notice provision became effective when Debtor requested authority for the merger of the pension plans. This merger clearly affected the Appellant's interest in the plan which satisfied the requirement of a material change of the provision. Further, a debtor may not reap benefits by accepting part of an executory contract and rejecting part. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir.1985). Finally, Section 365(a) of the Bankruptcy Code clearly states that a rejection of an executory contract may only be done with the court's approval. 11 U.S.C. § 365(a). See *In Re W & L Associates, Inc.*, 71 B.R. 962, 966 (Bkrtcy.E.D.Pa.1987). Debtor cites *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), as authority for rejecting an executory contract without court approval. This case was superseded by statute and is not relevant here. See 11 U.S.C. § 1113(a).

If given the proper sixty day notice it was entitled to, Appellant would have had the opportunity to present evidence establishing a trust in its favor, which would have denied the Bankruptcy Court jurisdiction to grant the merger. Appellant may have also established its entitlement to an equitable claim in the overfunding of the pension plans by convincing the court a "segment closing" had occurred. Six business days is not enough time to establish these defenses. In fact, the Bankruptcy Court eventually determined that a "segment closing" occurred subsequent to the filing of this appeal. If given sixty days, Appellant may have established this claim before the Bankruptcy Court permitted the merger.

CONCLUSION

Although the Bankruptcy Court had jurisdiction to grant Debtor's motion for au-

**668**

thority to merge the Defined Benefit Pension Plans, Appellant had a right, as a matter of law, to assert and secure an equitable interest in the plans before the merger occurred. The Bankruptcy Court can determine the Appellant's equitable interest in the pension plans pursuant to the applicable sections of the Federal Acquisition Regulations. Pursuant to the Bankruptcy Court's order dated March 29, 1990 granting Debtor's motion to merge the plans, Debtor was required to maintain records on the status of the plans before and after the merger. Further, Appellant was entitled to the sixty day notification period. Accordingly, it is

ORDERED that the Bankruptcy Court's Order granting Bicoastal Corporation authority to merge the defined benefit pension plans is REVERSED and REMANDED for proceedings consistent with this decision. The Clerk of the Court is directed to enter judgment with this Order. All requests for Oral Arguments are DENIED.

DONE and ORDERED.